**UNITED STATES of America, Plaintiff-Appellee,**

v.

**J. W. ROBINSON et al., Defendants-Appellants.**

**No. 71–1058.**

United States Court of Appeals, Fifth Circuit.

On Suggestion for Hearing En Banc Nov. 12, 1971.

Filed Jan. 12, 1972.

Rehearing En Banc Granted July 21, 1972.

See also, D.C., 319 F.Supp. 295.

For opinion on rehearing en banc, see 472 F.2d 973.

Henry Carr, **Carr** & Emory, Miami, Fla., for J. W. Robinson, Mario Escandar and others.

Donald I. Bierman, Acosta & Duran, Miami, Fla., for Aleida Jiminez.

James J. Hogan, Miami Beach, Fla., court appointed for Margarita Arce De Armas.

Alan E. Weinstein, Associate Counsel, Miami Beach, Fla., for De Armas.

Guillermo Sostchin, Miami, Fla., for Mario Escandar.

Jose E. Martinez, Jerome P. Ullman, George A. Kokus, Asst. U. S. Attys., Robert W. Rust, U. S. Atty., Miami, Fla., John J. Robinson, Atty., U. S. Dept. of Justice, Criminal Division, Washington, D. C., for plaintiff-appellee.

Ragano & LaPorte, Miami, Fla., for appellant.

## ON SUGGESTION FOR HEARING EN BANC

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

No Judge in regular active service on the Court having requested that the Court be polled on hearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Hearing En Banc is denied.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

CLARK, Circuit Judge:

This appeal was intended to raise the constitutionality of Title III of the Omnibus Crime Control and Safe Streets Act of 1968,[1] which permits wiretaps and other electronic surveillance methods as crime detection aids. But, with the development of facts unknown until the case was before this court, it turns out to present only the question of who may initiate an application to engage in such secret electronic surveillance under the authorization proviso of that legislation.[2]

The defendants were convicted solely upon evidence gleaned from two wiretaps conducted under the authority of

---

1. 18 U.S.C.A. § 2510 et seq.

2. 18 U.S.C.A. § 2516(1).

Title III. According to the affidavits filed in this court after a challenge was raised by appellants, the Executive Assistant to the Attorney General of the United States, acting under authority delegated by the Attorney General, "approved actions" specially designating an Assistant Attorney General to authorize the application to a Judge for the wiretaps here in question.[3] This proxy commission was then routinely executed *quid pro quo* by a Deputy Assistant Attorney General who subscribed the Assistant's name on letters to the United States Attorney for the Southern District of Florida, empowering the latter to file an application in this case as a matter of "standard procedure".[4]

■ Section 2516(1) provides in pertinent part:

The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made.

On its face, this section only permits the Attorney General or an Assistant Attorney General who has been specially designated by the Attorney General to authorize an application for judicial sanction of this intrusion into a citizen's privacy. To justify the first step in commencing this procedure without the direct action of any of these designated officials, the affidavit of the Executive Assistant, refers to a prior enactment, 28 U.S.C.A. § 510, which provides:

The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General.

Since § 510 already existed when § 2516(1) was enacted, the inclusion in the later statute of language specifying

3. AFFIDAVIT

District of Columbia:

Sol Lindenbaum, being duly sworn, deposes and says:

I am Executive Assistant to the Attorney General of the United States.

On May 18, 1970, June 10, 1970, and June 12, 1970, I approved actions designating Will Wilson to authorize Robert W. Rust to make applications to a Federal judge, under 18 U.S.C. 2518, for interception orders with respect to certain telephones in Miami Florida, used by Mario Escandar, Juan Rentoy, and others. In doing so, I acted pursuant to authorization by the Attorney General, under 28 U.S.C. 510, to act on the interception of wire communications in this situation. In accordance with the Attorney General's directions, I informed him concerning my actions as soon as practicable so that he could order the interceptions terminated if he did not approve of them. He did not direct termination of any of these interceptions.

4. AFFIDAVIT

District of Columbia:

Henry E. Petersen, being duly sworn, deposes and says:

I am Acting Assistant Attorney General in charge of the Criminal Division, United States Department of Justice.

I signed Will Wilson's name to the letters dated May 19, 1970, June 10, 1970, and June 12, 1970, notifying Robert W. Rust that he was authorized to make court applications under 18 U.S.C. 2518 for interception orders and for an extension of the interception order issued on May 21, 1970, with respect to certain telephones in Miami, Florida, used by Mario Escandar, Juan Restoy, and others. At those times, I was a Deputy Assistant Attorney General in the Criminal Division and acted in accordance with the authorization of Will Wilson and the standard procedures of the Criminal Division. The signing of Will Wilson's name was in conformity with the standard procedure of dispatching such a letter in every case in which Will Wilson had been specially designated on an *ad hoc* basis to authorize the applicant to make the application.

who the Attorney General could specially designate to perform the instigating function would have been surplusage if Congress meant that the Attorney General could authorize the performance of this duty by any officer, employee or agency of his department. We therefore conclude that § 2516(1) was intended to operate as a limit upon § 510, rather than that § 510 broadened the circumscribed authority set out in § 2516(1).

The legislative history of § 2516(1) as well as simple logic, compels the conclusion that § 510 must not be read as liberalizing the narrow limits Congress placed on who could initiate the wiretap process. An enlightening source of legislative history is contained in Senate Report 1097.[5] In referring to § 2516 (1), this report states:

> Paragraph (1) provides that the Attorney General, or any Assistant Attorney General of the Department of Justice specifically designated by him, may authorize an application for an order authorizing the interception of wire or oral communications. This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of

responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen. 1968 U.S.Code Cong. & Adm.News. p. 2185.

By expressing its intention that only "a publicly responsible official subject to the political process" could initiate a wiretap application, Congress wanted to make certain that every such matter would have the *personal* attention of an individual appointed by the President and confirmed by the Senate.[6] Its reasoning was that this narrow limitation to top department officials would (1) establish a unitary policy in the use of the awesome power conferred, and (2) require that power to be exercised with a circumspection reenforced by ready identifiability of he who was responsible for its use, thus maximizing the guarantee that abuses would not occur.[7]

■ An examination of the affidavits filed in this court shows this congressional scheme was severely undercut in the case at bar. Neither official avers that he or anyone else ever made a determination to initiate this particular procedure. The Executive Assistant who was authorized to act in this situation merely "approved actions designating Will Wilson to authorize" the judicial application. In turn, Wilson's deputy states he acted automatically as he

---

5. This report, dated April 29, 1968, accompanied Senate Bill 917 and is published in its entirety in United States Code Congressional and Administrative News, 90th Congress—2nd Session, Vol. 2 (1968). The text of this Senate Bill, which was substituted for a 1967 House Bill, H.R. 5037, entitled "Law Enforcement and Criminal Justice Assistance Act of 1967", substantially revised the concepts of that prior proposal. The Senate Bill which Senate Report 1097 describes contains the language finally enacted by the Congress. Other sources of legislative history offer scant illumination. *See e. g.*, Congressional Record— Senate, May 22, 1968, pp. 14469, 14473, 14474.

6. In the case of the Attorney General, *see* 28 U.S.C.A. § 503. As to the nine Assistant Attorneys General, *see* 28 U.S. C.A. § 506.

7. The instant proceeding offers dramatic proof that the hazard to privacy Congress sought to protect with its restrictions was substantial. One of the telephone conversations monitored and recorded pursuant to this very wiretap order was between a married defendant and his paramour. It contained lascivious passages of the most intimate nature. A transcription of this entire exchange was made and filed with the court, as required by 18 U.S.C.A. § 2518(8) (a). At oral argument it was conceded by the government that an unauthorized disclosure of this salacious record had somehow occurred, with the result that the matter received notoriety through a magazine circulated in the community.

did "in every case" where Wilson was so designated. Strangely, the action of the Attorney General's Executive Assistant in designating an Assistant Attorney General to authorize the application took from rather than added to the protections intended by Congress. If the Executive Assistant could act in the place and stead of the Attorney General, he could have proceeded to directly authorize the application. At least such a direct authorization would have assured that the application was deemed warranted in this particular case and was not "routinely" made by the Assistant Attorney General's deputy, "in conformity with the standard procedure." The fact that the Attorney General was told that his Executive Assistant had approved actions to designate Wilson in this case "as soon as practicable", while commendatory, does not validate the procedures *nunc pro tunc*. His authority from Congress was to initiate wiretap applications, not to seek to have those terminated he found should never have been requested in the first place. The citizen's right to be left alone demands that the spirit require strict compliance with the letter of this legislative proviso.

The government relies upon December 1968 Grand Jury v. United States, 420 F.2d 1201 (7th Cir. 1970), which held that § 510 could be used by the Attorney General to delegate the powers invested in him under 18 U.S.C.A. § 2514 of Title III, to grant immunity from prosecution to witnesses whose testimony is necessary to the public interest. The statute merely provides that any United States attorney "upon the approval of the Attorney General" may apply to a court for an order requiring such a witness to testify, with the proviso that such a court order would have the effect of conferring upon the witness complete transactional immunity. Senate Report 1097 similarly explains Congress's purpose in enacting this proviso.[8] Thus it is apparent, both by a comparison of the text of the two statutes and their legislative history, to discern that Congress was not dealing with similar problems in these two provisos. The decision to ask a court to compel testimony with a consequent grant of immunity does not involve an action even approaching the gravity which attaches to the decision to apply for permission to engage in secret electronic surveillance. Congress could justifiably feel it important that the public know that only an identifiable person subject to the political process could trigger the unknown, unseen, unheard intrusion into private affairs that are constitutionally protected against unreasonable searches, entitled to freedom from self-incriminatory results, and presumptively innocent. With equal propriety, Congress could choose to permit a broader number of properly designated persons to ask a court to require a witness to relate facts he knows and, as a price therefor, relieve him of prosecution for his involvement and past actions

8. Section 2514 of the new chapter provides for the granting of immunity from prosecution in the investigation of violations of the chapter and the offenses enumerated in section 2516. Since unlawful electronic surveillance is typically a clandestine crime, often committed by an individual at the instigation of another person, the usual techniques of criminal investigation will not, as in organized crime investigations, be adequate to enforce the prohibitions of the statute. The privilege against self-incrimination would work in most cases to prevent the principals behind the overt acts of others from being held legally accountable. Consequently, an immunity grant will be necessary to enforce effectively the prohibitions of the statute and safeguard privacy. Under the proposed section, the grant of immunity would have to be approved by the Attorney General and would be effective only upon an order of the court. The provision is patterned after provisions in other laws which have been upheld and found effective. It is intended to reflect existing law (Ullman v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), upholding 18 U.S.C. § 3486 (1964), as amended, 18 U.S.C. 3486(c) (Supp. 1, 1965); Reina v. United States, 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960), upholding 18 U.S.C. § 1406 (1964).

which are often already fully known to the law and many times the subject of public charges.[9]

Our decision is reached with full recognition that the statute burdens the Attorney General, who is required to give his individual attention to many affairs of great importance. However, if the load on this officer is to be lessened, such relief must come from the Congress.

■ Since the entirety of the evidence used to convict these defendants is conceded to have eventuated from these improperly authorized wiretaps, it follows that such evidence ought to have been suppressed. The record before this court does not disclose that these defendants moved the court below for a new trial. Without the evidence which must be suppressed, there is nothing in the record on which the convictions may stand. Under this Circuit's decision in United States v. Musquiz, 445 F.2d 963 (5th Cir. 1971), the judgments of conviction are reversed and these appeals are remanded to the district court with directions to dismiss the indictment.

Reversed with directions.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC.

Before JOHN R. BROWN, Chief Judge, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

9. Compare the power of any United States Attorney to refuse to permit a Grand Jury's true bill to become an effective indictment United States v. Cox, 342 F.2d

It is ordered that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

167 (5th Cir. En Banc 1965), cert. denied, Cox v. Hauberg; 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1967).